UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MIDDLESEX INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>DIXIE MECHANICAL, INC.; PATRIOT MODULAR, INC.; ELDECO PIPE & FABRICATION, LLC; and ROBINSON MECHANICAL CONTRACTORS, INC. d/b/a ROBINSON CONSTRUCTION CO.,<br><br>    Defendants. | CIVIL ACTION NO.<br>1:20-cv-04971-JPB |

## ORDER

Before the Court is Plaintiff Middlesex Insurance Company's ("Middlesex") Motion for Summary Judgment ("Motion"). ECF No. 38. Having reviewed and fully considered the papers filed therewith, the Court finds as follows:

### I.   BACKGROUND

This insurance coverage action derives from a suit IHI E&C International Corporation ("IHI") filed in this Court against Robinson Mechanical Contractors, Inc. d/b/a Robinson Construction Company ("Robinson") and Fidelity and Deposit Company of Maryland. IHI's suit alleges several causes of action against

Robinson in connection with a construction project in Elba Island, Georgia. In IHI's suit, it alleges that it subcontracted certain construction work to Robinson, including pipe rack and process module installation. IHI asserts that Robinson breached the subcontract because its pipe racks contained defective welds, and Robinson ultimately abandoned the project. IHI alleges damages of at least thirty-seven million dollars, including for rework and repair costs; excess re-procurement costs; costs to obtain replacement contractors; consultant and expert fees; and attorneys' fees and related costs.

As a result of IHI's claims, Robinson filed a third-party complaint against Patriot Modular, Inc. ("Patriot"). Robinson alleges that it subcontracted with Patriot for much of the work under Robinson's contract with IHI. Robinson denies that it breached its contract with IHI and asserts that to the extent that Robinson is found liable to IHI for any defective work, delays or breaches of contract in connection with tasks subcontracted to Patriot, Robinson is entitled to recover such amounts from Patriot.

Patriot, in turn, filed a fourth-party complaint against Dixie Mechanical, Inc. ("Dixie") and Eldeco Pipe and Fabrication, LLC. Patriot alleges that it subcontracted with Dixie to perform fabrication, welding, testing and inspection of pipes under Patriot's subcontract with Robinson. Dixie's work was completed at

its facilities in Tuscaloosa, Alabama and shipped to Georgia, pursuant to Dixie's agreement with Patriot.  Patriot contends that to the extent it is found liable to Robinson for any defective work, delays or breaches of contract for Dixie's work, Patriot is entitled to recover such amounts from Dixie.

Patriot also asserted a claim for indemnification against Dixie under Article 18 of Patriot's subcontract with Dixie.  Article 18 provides that Dixie must indemnify Patriot for patent, trademark, trade name or copyright claims.

In the instant action, Middlesex seeks a declaration that it owes no duty to defend or to indemnify Dixie for any liability or damages arising out of the Elba Island project.  Middlesex's complaint is based on a policy it issued to Dixie that was effective during the relevant period (the "Policy").

As relevant here, the Policy's Commercial General Liability Coverage Form provided coverage for "those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage'" resulting from an "occurrence." The Policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  "Property damage" was defined as "[p]hysical injury to tangible property" or "[l]oss of use of tangible property that is not physically injured."  The Policy also contained certain additional exclusions, which are typically referred to as business risk exclusions.

The Additional Insured – Supplemental Declarations endorsement of the Policy stated that persons or organizations who must be added as "an additional insured under a written contract or written agreement in effect prior to any loss or damage" and are listed in the endorsement are covered as Additional Insureds. No person or organization was listed as an Additional Insured on the endorsement.

Middlesex contends that the claims of faulty workmanship in the underlying complaints constitute neither an "occurrence" nor "property damage" as those terms are defined in the Policy, and the exclusions in the Policy additionally preclude coverage for Dixie. Middlesex also argues that Patriot is not an Additional Insured under the Policy because Patriot's subcontract with Dixie did not require Dixie to add Patriot to the Policy, and Patriot is not listed in the Policy as an Additional Insured. Middlesex further contends that Patriot is not otherwise entitled to indemnification under the Policy because the indemnification provision in Patriot's subcontract with Dixie is limited to intellectual property claims.

## II. DISCUSSION

### A. Legal Standard

"Summary judgment is appropriate when the record evidence, including depositions, sworn declarations, and other materials, shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting Fed. R. Civ. P. 56) (quotation marks omitted).  A material fact is any fact that "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Ultimately, "[t]he basic issue before the court … is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen*, 121 F.3d at 646 (citation omitted).

The party moving for summary judgment bears the initial burden of showing that no genuine issue exists as to any material fact, "and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." *Id.*

After the movant satisfies this initial burden, the nonmovant bears the burden of showing specific facts indicating summary judgment is improper because a material issue of fact does exist.  *Id.*  In carrying this burden, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice;

there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

In sum, if the record taken as a whole cannot lead "a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

### B. <u>Analysis</u>

Georgia law is clear that the "construction [of a contract] is a matter of law for the court."[1] *Envision Printing, LLC v. Evans*, 786 S.E.2d 250, 252 (Ga. Ct. App. 2016); *see also Gans v. Ga. Fed. Sav. & Loan Ass'n*, 347 S.E.2d 615, 618

---

[1] In this diversity action, the parties dispute what law governs the analysis. Dixie contends that Georgia law applies because in choice of law cases, Georgia courts apply Georgia common law, unless the dispute is governed by a statute of the foreign jurisdiction, which is not the case here. Middlesex, on the other hand, contends that Alabama law applies because Dixie is based in Alabama, and the Policy was delivered in that state. "A federal court faced with [a] choice of law issue must look for its resolution to the choice of law rules of the forum state." *Frank Briscoe Co. v. Georgia Sprinkler Co.*, 713 F.2d 1500, 1503 (11th Cir. 1983). Under Georgia's choice of law rules, "it is clear that the application of another jurisdiction's laws is limited to statutes and decisions construing those statutes," and "[w]hen no statute is involved, Georgia courts apply the common law as developed in Georgia rather than foreign case law." *Id.*; *see also Coon v. Med. Ctr., Inc.*, 797 S.E.2d 828, 834 (Ga. 2017) ("In the absence of a statute, . . . at least with respect to a state where the common law is in force, a Georgia court will apply the common law as expounded by the courts of Georgia."). The Court therefore agrees with Dixie that Georgia law applies to its insurance coverage dispute with Middlesex.

6

(Ga. Ct. App. 1986) ("It is ordinarily the duty of the court to interpret a contract as a matter of law"). Insurance contracts are treated like any other contract and "are interpreted by [the] ordinary rules of contract construction." *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 498 S.E.2d 492, 494 (Ga. 1998).

> Construction of a contract requires three steps:
>
> First, the trial court must decide whether the language is clear and unambiguous. If it is, no construction is required, and the court simply enforces the contract according to its clear terms. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

*Envision Printing*, 786 S.E.2d at 252 (quoting *General Steel v. Delta Bldg. Sys.*, 676 S.E.2d 451, 453 (Ga. Ct. App. 2009)).

"The court [initially] looks to the four corners of the agreement to ascertain the meaning of the contract from the language employed." *Brogdon v. Pro Futures Bridge Cap. Fund, L.P.*, 580 S.E.2d 303, 306 (Ga. Ct. App. 2003). "[W]here the language of [the] contract is clear, unambiguous, and capable of only one reasonable interpretation, no construction is necessary or even permissible by the trial court." *Ainsworth v. Perreault*, 563 S.E.2d 135, 140–41 (Ga. Ct. App. 2002); *see also Triple Eagle Assocs., Inc. v. PBK, Inc.*, 704 S.E.2d 189, 195–96 (Ga. Ct. App. 2010) (stating that "where the terms of a written contract are plain and

7

unambiguous, a court must confine itself to the four corners of the document to ascertain the parties' intent, and is not permitted to strain the construction of a contract, so as to discover an ambiguity") (internal punctuation omitted); *Tripp v. Allstate Ins. Co.*, 584 S.E.2d 692, 694 (Ga. Ct. App. 2003) (quoting *Grain Dealers Mut. Ins. Co. v. Pat's Rentals*, 505 S.E.2d 729, 730 (Ga. 1998)) (stating that the plain meaning of unambiguous terms "'must be given full effect, regardless of whether they might be beneficial to the insurer or detrimental to the insured'").

In the context of an insurance policy, an ambiguity is "strictly construed against the insurer as drafter of the document" as is any exclusion from coverage invoked by the insurer. *Richards v. Hanover Ins. Co.*, 299 S.E.2d 561, 563 (Ga. 1983). The insurance policy is also "read in accordance with the reasonable expectations of the insured where possible." *Id*.

"But an equally valid rule is that an unambiguous policy requires no construction, and its plain terms must be given full effect even though they are beneficial to the insurer and detrimental to the insured." *Woodmen of World Life Ins. Soc. v. Etheridge*, 154 S.E.2d 369, 372 (Ga. 1967). As such, the court "ha[s] 'no . . . right by strained construction to make [a] policy more beneficial by extending . . . coverage'" where none exists. *Id*. at 426.

8

The Court undertakes the analysis of the Policy with these principles in mind.

**Commercial General Liability ("CGL") Policies Generally**

It is well settled that "CGL coverage generally is intended to insure against liabilities to third parties for injury to property or person, but not mere liabilities for the repair or correction of the faulty workmanship of the insured." *Taylor Morrison Servs., Inc. v. HDI-Gerling Am. Ins. Co.*, 746 S.E.2d 587, 591 (Ga. 2013). The Georgia Court of Appeals has explained that

> [t]he risk intended to be insured [under a CGL policy] is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or *damage to property other than to the product or completed work itself*, and for which the insured may be found liable. The insured . . . may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. *This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what [CGL coverage is] designed to protect against.* The coverage applicable under [a] CGL policy is for tort liability for injury to persons and damage to other property[,] and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

*Sapp v. State Farm Fire & Cas. Co.*, 486 S.E.2d 71, 75 (Ga. Ct. App. 1997).

**Coverage Definitions ("Occurrence" and "Property Damage")**[2]

In *American Empire Surplus Lines Insurance Co. v. Hathaway Development Co.*, the Georgia Supreme Court made clear that an "occurrence" under a CGL policy "can arise where faulty workmanship causes unforeseen or unexpected damage to *other* property." 707 S.E.2d 369, 372 (Ga. 2011) (emphasis added). However, "'occurrence' alone is not enough to give rise to coverage under a standard CGL policy. The 'occurrence' also must cause 'bodily injury' or 'property damage,' and the insured must incur a liability to pay 'damages because of [such] bodily injury' or 'property damage.'" *Taylor*, 746 S.E.2d at 591.

"'[P]roperty damage, as that term is used in the standard CGL policy, necessarily must refer to property that is non[]defective[] and to damage beyond mere faulty workmanship." *Id*. This is because "[p]roperty or work that is inherently defective because it was produced by faulty workmanship cannot be said to have been 'physically injured' [or damaged] by the very faulty workmanship that brought it into being in the first place." *Id*. at 592 n.10. Likewise, a "loss of use" necessarily requires that the property or work was previously usable. *See id*. In other words, property or work that "was unusable at

---

[2] The cases cited herein concern insurance policies that employ the standard definitions of "occurrence" and "property damage," which are the definitions used in Dixie's Policy.

its creation" and "is inherently defective cannot be said to have sustained a '[l]oss of use.'" *Id*.

Consistent with these principles, the court in *McDonald Construction Co. v. Bituminous Casualty Corp.* stated that "[f]or there to be coverage under a CGL policy for faulty workmanship, there would have to be damage to property other than the work itself[,] and the insured's liability for such damage would have to arise from negligence, not breach of contract." 632 S.E.2d 420, 423 (Ga. Ct. App. 2006). The court reiterated that "coverage applicable under [a] CGL policy is for tort liability for injury to persons and damage to other property and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained." *Id*. Because there was no evidence that the defective flooring installation at issue caused damage to other property or to any third party, the court concluded that the costs incurred in replacing the flooring were not covered by the CGL policy. *See id*.

Similarly, the court in *Empire Quality Construction, Inc. v. Western World Insurance Co.* found that "the costs of repairing or removing defective work [was] not a claim for property damage" under the CGL policy because "[w]hen a contractor must repair or replace an element of his own work, damaged by his own faulty workmanship, his standard CGL policy is not intended to provide

11

protection." No. 1:18-cv-4459-, 2019 WL 9633223, at *3 (N.D. Ga. Sept. 24, 2019); *see also Sapp*, 486 S.E.2d at 75 (finding that damages related to repairing or replacing defective floors and the "incidental" damages from the removal of the floor and the restoration of the house were not covered under the CGL policy); *cf. Auto-Owners Ins. Co. v. Unit Owners Ass'n of Riverview Overlook Condo., Inc.*, No. 1:13-cv-3012, 2014 WL 5465286, at *2 (N.D. Ga. Oct. 28, 2014) (finding that the CGL policy arguably provided coverage where the underlying complaint alleged that the defendant's faulty workmanship caused damaged to *other* areas of the property).

Here, the definitions of "occurrence" and "property damage" are clearly established under Georgia law. Therefore, no construction of the terms is necessary or even permissible. *See Ainsworth*, 563 S.E.2d at 140–41. Rather, the Court must simply interpret the terms according to their usual and common meaning under the law.

According to the law, damages flowing from Dixie's allegedly faulty workmanship can be considered "property damage" only if such damages resulted in bodily injury to third parties or were sustained on *other* property. The damages alleged here do not satisfy either condition. Specifically, Patriot seeks damages from Dixie to the extent that Patriot is found liable to Robinson for any defective

work, delays or breaches of contract based on Dixie's work.  There is no allegation that property other than the construction project was affected or that anyone suffered bodily injury as a result of the deficiencies.  Thus, the only reasonable interpretation of the allegations in the underlying complaints is that the asserted damages resulted from Dixie's allegedly faulty workmanship under the subcontract and affected only the construction project.

While Dixie acknowledges that the complaints assert only that the defective welds caused delays in delivering materials and completing the full scope of work, it urges that these allegations indicate a claim beyond faulty workmanship because IHI "could [ultimately] recover for numerous different types of damages." However, the Court cannot infer damage beyond faulty workmanship (or damage to other property) based on Dixie's hypothesis of what damages might materialize. Instead, the court must look at the allegations on the face of the complaint to determine whether a duty to defend or indemnify exists.  *See Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc.*, 490 S.E.2d 374, 376 (Ga. 1997); *see also Woodmen*, 154 S.E.2d at 426 (underscoring that a court may not strain the facts to extend coverage where none exists).

Additionally, the record is clear that the Elba Island project was not in use when the alleged defects were discovered.  The allegedly faulty workmanship was

identified and remediated during the construction of the facility—before the facility was placed in use. For this reason, the asserted delays were incidental to the allegedly faulty workmanship and did not cause a loss of use of the facility as that term is used in the context of a CGL policy. *See Taylor*, 746 S.E.2d at 592 n.10.

The opinion in *Meritage Homes of Georgia, Inc. v. Grange Insurance. Co.* 528 F. Supp. 3d 1312 (N.D. Ga. 2021), which Dixie cites in support of its argument for coverage is inapposite. In that case, the court recognized the axiomatic principles that (i) "[w]hen a contractor must repair or replace an element of his own work damaged by his own faulty workmanship, the standard commercial general liability policy is not intended to provide protection;" and (ii) a CGL policy would apply only to "'damage beyond mere faulty workmanship' on the work the insured was hired to perform." *Id*. at 1320 (citation omitted). Because the plaintiffs in *Meritage Homes* alleged that the defective grading at issue ruined the landscaping and other parts of the property, the court concluded that "there was a claim for property damage beyond the defective work done by [the defendant]" and that the CGL policy therefore provided coverage. *Id*. The circumstances here are different because there is no allegation of damage to other property in this case.

Dixie is correct that the duty to defend is separate from and broader than the duty to indemnify.  However, it is also true that the duty to defend turns on whether a liability covered by the policy is asserted in the underlying complaint. *See Shafe v. Am. States Ins. Co.*, 653 S.E.2d 870, 873 (Ga. Ct. App. 2007).  Because the Court has already found that the underlying complaints in this case do not allege a property damage claim that would be covered under the Policy, it follows that there is no duty to defend here.

In short, the damages alleged in the complaints do not constitute "property damage" within the meaning of the Policy, and the CGL Policy consequently does not provide coverage for the claims asserted regarding Dixie's workmanship.[3] Based on the foregoing analysis, the Court finds that Middlesex has no duty to

---

[3] Middlesex also seeks a declaration that Patriot is not an Additional Insured under the Policy and is not entitled to indemnification under Patriot's subcontract with Dixie.  Patriot defaulted in this matter and has therefore admitted the well-pleaded allegations of Middlesex's complaint.  *See Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1336 (11th Cir. 2014).  Dixie did not respond to Middlesex's arguments as to Patriot's entitlement to relief.  Therefore, Middlesex's motion as to Patriot is unopposed.  *See* N.D. Ga. Civ. R. 7.1(B) (stating that the "[f]ailure to file a response [to a motion] shall indicate that there is no opposition to the motion").  In any event, the record reflects that Patriot was not listed as an Additional Insured under the Policy.  Further, the indemnification provision in Patriot's subcontract with Dixie concerned only patent, trademark, trade name or copyright claims whereas the underlying complaints assert only construction defect claims.  Accordingly, the Court finds that Patriot does not qualify as an Additional Insured under the Policy and is not otherwise entitled to indemnification under the Policy.

15

defend or to indemnify Dixie under the Policy for the allegations of faulty workmanship relating to Dixie's performance under its subcontract with Patriot.[4] The Court also finds that Patriot is not an Additional Insured under the Policy and is not entitled to indemnification from Dixie under the Policy.[5]

The Clerk is **DIRECTED** to issue judgment in favor of Middlesex on its Motion (ECF No. 38) and close the case.

**SO ORDERED** this 27th day of September, 2022.

_____
J. P. BOULEE
United States District Judge

---

[4] The Court disagrees with Dixie's contention that questions regarding the duty to indemnify are ripe for determination only after the insured's liability is established. "[T]he propriety of deciding both a duty to defend and to indemnify in the same declaratory judgment action is well established." *ALEA London Ltd. v. Woodcock*, 649 S.E.2d 740, 747 (2007) (noting that the trend is to allow an insurer to bring an action regarding its liability under the policy and its duty to defend, even if the action against the insured is only threatened or is still pending (citing *Pa. Threshermen & Farmer's Mut. Cas. Ins. Co. v. Wilkins*, 127 S.E.2d 693, 695 (Ga. Ct. App. 1962))); *see also Auto-Owners Ins. Co. v. Earley*, No. 1:16-cv-1180, 2017 WL 3449600, at *5 (N.D. Ga. Feb. 2, 2017) (making the same observation).

[5] In light of these findings, the Court need not determine whether the alleged damages are otherwise precluded by the Policy's business risk exclusions.